Bubke, J. (dissenting).
The informations have been dismissed on the sole ground that the evidence adduced before the Grand Jury was legally insufficient to warrant their filing.
We do not agree with the conclusions reached as to the meaning and scope of the statutes said to have been violated, and hold that the dismissals were improper.
The Scopas and Cohen information charges the defendants with 21 counts of the crime of receiving compensation for the placing out of children (Penal Law, § 487-a), 21 counts of unauthorized placing out of children (Social Welfare Law, §§ 371, 374) and 1 count of conspiracy to commit these crimes (Penal Law, § 580).
The Scopas information charges defendant with 9 counts of receiving compensation for the placing out of children, and 9 counts of unauthorized placing out of children.
Section 487-a of the Penal Law, as applicable here, is as follows:
“1. No person and no agency, association, corporation, institution, society, or other organization, except an authorized agency # * *, may or shall request, receive or accept any compensation or thing of value, directly or indirectly, for placing out a child.
*124 “ 3. As used in this section the term placing out shall mean to arrange for the free care of a child in a family other than that of the child’s parent, step-parent, grandparent, brother, sister, uncle or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care.”
Sections 371 and 374 of the Social Welfare Law contain a repetition of the above definition and a prohibition against the placing out of a child except by an authorized agency.
Testimony before the Grand Jury showed that couples seeking to adopt an orphan were referred to defendants’ offices in New York County, where they were shown photographs of orphaned Greek children. From these pictures, they made their selection and agreed to pay defendants various sums, ranging from $1,500 to $2,800 plus cost of transportation to New York, in several installments. Defendants then made arrangements to have the children legally adopted, by proxy, in Greece, and provided transportation for them to New York, where they were released to the adoptive parents, who then met them for the first time.
General Sessions has held that the language of the act indicates that the statute is violated only in a case where the care arranged for precedes the adoption. Defendants argue, in the alternative, that the determination of the status of the family must take place after the adoption rather than at the time of the arrangements.
We believe that the key to the interpretation of the statute must be one of time and that a fair reading of the words of the statute indicates that the crucial moment is the time when the arrangements and the payments of compensation are made. It is at that point that the entire character of the transaction should be judged; then it is that a person entering, perhaps innocently, into such an arrangement would himself look to the law for a consideration of his status, not when the entire transaction had been completed.
As we read section 487-a of the Penal Law, that which is prohibited is: (1) receiving compensation; (2) for arranging;' (3) for the free care of a child; (4) in a family, other than those specifically listed; (5) for the purpose of adoption or of providing care. Clearly, evidence was presented here from which the Grand Jury might believe that defendants had (1) received *125 compensation; (2) had made arrangements; (3) for the free care of a child; (4) in a family which, at the time of the arranging, was not of those listed; (5) for the purpose of adoption and/or providing care, subsequent to the time of the arrangements.
There can be no doubt that it was the intent of the Legislature to prevent and prohibit all arrangements, involving compensation, taking place prior to the actual adoption, since it considered such operations socially undesirable and contrary to State policy. (Report of Special Committee on Social Welfare of Joint Legislative Committee on Interstate Co-operation [N. Y. Legis. Doc., 1949, No. 62], p. 48.)
“ [A] penal statute * * * must be construed according to the fair import of [its] terms, to promote justice and effect the objects of the law ” (Penal Law, § 21).
Among other amendments in 1949, the definition of the term “ placing out ” was changed from “ to provide for the care of a child in a free home, in a family other than that of a relative within the second degree ” (Social Welfare Law, § 371, former subd. 12), to its present form. In considering, and subsequently commenting on this and connected legislation, the Reports of the Special Committee on Social Welfare & Relief of the Joint Legislative Committee on Interstate Co-operation for the years 1947,1948 and 1949 (N. Y. Legis. Doc., 1947, No. 60; N. Y. Legis. Doc., 1948, No. 51; N. Y. Legis. Doc., 1949, No. 62) made the following comments:
(1947, p. 88): “ New York State’s present adoption laws provide that only an authorized agency, or the natural parent or guardian may place a child for adoption. It is however, possible, as the law is presently interpreted, for a person acting as the agent of the natural parent to arrange for the adoptive placement, and this circumstance has given rise to what is popularly known as the ‘ black market ’ in babies.”
(1948, p. 93): “ In formulating recommendations for legislative consideration, the Subcommittee has been most concerned at this time with the process by which children get into foster and adoptive homes; that is, with the placement process. The Subcommittee has not been concerned with the legal aspects of adoption, or with the functions or procedures of the courts in this regard.
*126 “ Protection for children being placed for adoption at once raises the question of the similar protection which children need who are separated from their own families and placed in other types of foster family homes. The adoptive home is, after all, a foster home, just as is a boarding home, a free foster home, a home where the child works for his care, or receives a wage, and finally the foster home which may be that of an unrelated guardian, functioning either legally or casually. Thus the Subcommittee has come to believe that the lato should extend its protection to any child placed with unrelated persons for extended care, whether for adoption or otherwise.” (Emphasis added.)
(1949, pp. 48-49): “ [T]wo types of placements are possible under present New York State law: (1) placements by authorized agencies, as defined in the Social Welfare Law * * *; and (2) placements by parents, guardians or relatives within the second degree, or by intermediaries, acting on behalf of the parent or guardian. This latter group are referred to as 1 voluntary ’ or ‘ independent ’ placements. Where they involve the payment of money in consideration of the placement, they are commonly referred to as 1 black market ’ or ‘ bootleg ’ placements.” (Emphasis added.)
(1949, p. 55): “ Insofar as the activities of intermediaries are concerned, your Committee believes that where they involve the payment or receipt of money they are unjustifiable and should be prohibited. The buying and selling of human beings was supposed to have been stopped in this country in 1865. Your Committee can see no justification for permitting trafficking in babies.”
While the Legislature was, therefore, primarily concerned with in-State adoptions, it contemplated extending the protection of its enactments over all of that period prior to the adoption itself, during which “ arrangements ” involving the payment of money and future care of children might be made.
The crime arises in the ‘ ‘ arrangements ’ ’ made for the unauthorized placing out of a child. The evil is found in the business which may arise from such placements. A trade in human beings was not intended to be permitted, and cannot be condoned, regardless of by how circuitous a route the practice is conducted.
*127 It follows then that “ arrangements ”, taking place prior to an adoption whereby a child is placed in a family which, at the time of the arrangements, is not one of those listed, for the purpose of adoption and/or providing care, are prohibited by the Social Welfare Law, if not done by an authorized agency, and are misdemeanors under the Penal Law, where compensation is received.
The defendants also contend that the laws of the State of New York were superseded and rendered ineffectual, under the supremacy clause of the United States Constitution, by Federal legislation designed to encourage proxy adoptions abroad of foreign orphans.
The statute referred to is the Refugee Relief Act of 1953 (U. S. Code, tit. 50, Appendix, § 1971c) and its 1957 successor (U. S. Code, tit. 8, § 1205). The purpose of this act was to admit to the United States 214,000 aliens to become permanent residents. Of this number, “ 186,000 were to be refugees and escapees from Communist persecution, both in Europe and Asia; 19,000 were to be close relatives of American citizens and of permanent-resident aliens of the United States; 4,000 were to be orphans; and 5,000 were to be aliens who had already come to the United States as new immigrants and under the conditions specified in this act were permitted to acquire permanent-resident status if they could not return abroad because of persecution or fear of persecution on account of race, religion, or political opinion ’ ’. (Final report of Administrator of Refugee Relief Act of 1953, as amd., p. 3.)
It is the contention of the defendants that this statute effectively precludes the States from imposing restrictions in addition to those contained therein for such immigrants.
Despite statements to the contrary there is nothing in either the act itself, or the regulations, about proxy adoptions abroad. We do not find any language in the statute or regulations that would lead us to the belief that this action by the Federal Government was intended to supersede and negate State legislation controlling State citizens in their actions within the State. The Federal act was intended to only apply after the adoptions had taken place abroad, and to provide a manner in which those children could join their adoptive parents. No consideration whatsoever is given in the act to those “ arrangements ” in the *128 various States, which might precede proxy adoptions. This is a matter which remains with the States. “It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed.” (Schwartz v. Texas, 344 U. S. 199, 202-203.)
The Federal law was designed simply to permit certain classes of persons, who might otherwise not be able to obtain visas, to enter this country. There is no indication of an intent on the part of Congress to create a new sphere of business activity in the selling of orphan babies.
Since the actions of the defendants were governed by the New York statute, the informations stated a crime and were filed properly.
The orders below should be reversed and the informations reinstated.
Judges Fuld, Froessel and Van Voorhis concur with Judge Dye; Judge Burke dissents and votes to reverse and to reinstate the informations in an opinion in which Chief Judge Desmond and Judge Foster concur.
Orders affirmed.